Raymond Anthony JOAO, and Robert Richard Bock, Plaintiffs,

v.

SLEEPY HOLLOW BANK and Jack Henry & Associates, Inc. Defendants.

No. 03CIV.10199 (CM)(MDF).

United States District Court, S.D. New York.

Nov. 30, 2004.

John W. Fried, Fried and Epstein, New York City, for Plaintiffs.

Oliver J. Armas, Thacher Profitt and Wood LLP, New York City, for Defendants.

## DECISION CONSTRUING DISPUTED CLAIM TERMS (Markman Decision)

MCMAHON, District Judge.

This is a patent infringement case.

Plaintiff, Raymond Joao, is a licensed patent attorney. He holds nineteen patents and has more than thirty pending applications. In March 2003, Joao and Robert Bock obtained patent number 6,529,725 ("the '725 patent") for something called a "transaction security apparatus and method." In plain English, the patent was for a device that would notify a person on-line that a transaction involving his bank account was occurring, thus giving him the opportunity to disallow the transaction. Plaintiffs contend that the patent covers defendant Jack Henry's software products, which enable banks and their customers to perform stop payment transactions over the Internet. Defendant Sleepy Hollow Bank is a licensed user of Jack Henry's software.

To date, plaintiffs have not produced, made, sold or licensed their invention, and it is not clear who would buy it, since banks were offering remote banking services—services that include the ability to issue a stop payment order to a bank—for

some years prior to the issuance of this patent. Nonetheless, plaintiffs insist that their claims read on Jack Henry's stop payment software and sue for infringement.

■ Before reaching the merits, this Court must construe the terms used in the patent. This function has resided with the Court since the Federal Circuit decided, in *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 978–79 (Fed.Cir.1995), *aff'd* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996), that the construction of a patent was a question of law for a judge, not one of fact for a jury. Only after the court construes the claims in the patent can the parties proceed to adjudicate the merits issues of validity and infringement.

■ The form a *Markman* hearing takes lies in the sound discretion of the Court. *See, e.g., Rubie's Costume, Co. v. Disguise, Inc.*, No. 99 Civ. 3189(AGS), 2000 WL 798627, *1–2, 2000 U.S. Dist. LEXIS 8657, *1–2 (S.D.N.Y. June 20, 2000). In this case, thanks to counsels' herculean efforts, the number of relevant claims has been greatly reduced, and stipulations have been entered with respect to the vast majority of the relevant terms. In fact, there are only seven disputed terms for me to construe. Counsel have submitted thorough briefs and record references, together with a very handy side-by-side comparison of their respective arguments (the Joint Markman Claim Construction Statement). With the assistance of this helpful document, I find that I can construe the disputed terms based on the paper record before me. There is no need to hold a live hearing with testimony and oral argument. I am grateful to counsel for their excellent work in distilling the record and narrowing the issues.

## Principles of Claim Construction

Certain principles that are deeply embedded in patent law guide the court in claim construction.

■ The meaning of a claim should be interpreted in light of the intrinsic evidence, comprised of the claims and the specification of the patent, and the prosecution history. *Markman*, 52 F.3d at 979. The intrinsic evidence constitutes the public record of the patent on which the public is entitled to rely. *Id.* Thus, if the intrinsic evidence is sufficient to resolve the meaning of a disputed term, it is improper to resort to extrinsic evidence, such as expert testimony or treatises. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed.Cir.1996). Extrinsic evidence only should be relied upon where necessary to resolve an ambiguity in a disputed claim term. *CVI/Beta Ventures, Inc. v. Tura, L.P.*, 112 F.3d 1146, 1153 (Fed.Cir. 1997).

■ To define the scope of the patented invention, the Court must first look at the words of the claims themselves. *Vitronics Corp.*, 90 F.3d at 1582 (citing *Bell Communications Research, Inc. v. Vitalink Communications Corp.*, 55 F.3d 615, 620 (Fed.Cir.1995)). Words in the claim are generally given their ordinary and customary meaning. However, "a patentee may choose to be his own lexicographer" and assign special definitions to the words in the claim, as long as those definitions are clearly stated in the patent specification or file history. *Id.* (citing *Hoechst Celanese Corp. v. BP Chems. Ltd.*, 78 F.3d 1575, 1578 (Fed.Cir.1996)). Therefore, "it is always necessary to review the specification to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning. The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication." *Id.*

(citing *Markman,* 52 F.3d at 979). The Federal Circuit has stated that "claims must be read in view of the specification, of which they are a part." *Id.* (citing *Markman,* 52 F.3d at 979); *see also Gart v. Logitech, Inc.,* 254 F.3d 1334, 1341 (Fed. Cir.2001) ("it is certainly correct that the specification and the prosecution history should be consulted to construe the language of the claims."). Because the specification must contain a description sufficient to enable those of ordinary skill in the art to make and use the invention, the specification "is the single best guide to the meaning of a disputed claim term." *Id.*

█ The court also may consider the prosecution history of the patent. *Id.* (citing *Markman,* 52 F.3d at 980; *Graham v. John Deere,* 383 U.S. 1, 33, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966)). The prosecution history is the complete record of the proceedings before the Patent and Trademark Office. During the course of these proceedings, the applicant may have made express representations regarding the scope of the invention, so the prosecution history is "often of critical significance to determining the meaning of the claims." *Id.* (citing *Markman,* 52 F.3d at 980; *Southwall Tech., Inc. v. Cardinal IG Co.,* 54 F.3d 1570, 1576 (Fed.Cir.1995)). Claim terms may appear to contain plain language. However, the prosecution history may demonstrate that the claims do not cover some matters that would otherwise be encompassed in the plain meaning of the words used. Prosecution histories often contain an analysis of the distinctions between the prior art and the applicant's claims, providing the Court with clues to limitations of the claims. *Id.* at 1583; *Autogiro Co. of America v. United States,* 181 Ct.Cl. 55, 384 F.2d 391, 399 (1967). Furthermore, "the prosecution history limits the interpretation of claim terms so as to

exclude any interpretation that was disclaimed during prosecution." *Southwall Tech., Inc.,* 54 F.3d at 1576. Even when the written description would otherwise support a construction, the prosecution history, which is generated afterwards, can relinquish coverage of that claimed embodiment. *Rheox, Inc. v. Entact,* 276 F.3d 1319, 1325–27 (Fed.Cir.2002).

Finally, claim language should be read in a manner that causes the claim to make sense. Courts are to construe claims so as to sustain a patent's validity where possible. *ACS Hosp. Sys., Inc. v. Montefiore Hosp.,* 732 F.2d 1572, 1577 (Fed.Cir.1984).

**Construction of Disputed Claims**

### A. "At least one of ... and ... "

█ The first and most interesting disputed term is the phrase, "At least one of ... and ..." The phrase is used throughout the patent, in the same manner each time:

"[W]herein the limitation or restriction prohibits a withdrawal from *at least one of* a checking account, a savings account, *and* an automated teller account, or prohibits use of at least one of a checking account, a savings account, and an automated teller machine account." ('725 patent, Claims 108, 135, 138 and 164);

"[W]herein the banking transaction is *at least one of* a clearing transaction, a check clearing transaction, an account charging transaction, *and* a charge-back transaction." (*Id.,* Claim 118);

"[W]herein the apparatus is programmed for *at least one of* automatic activation, self-activation, automatic operation, *and* self-operation." (*Id.,* Claims 128 and 157); and

"[W]herein the banking transaction is *at least one of* a clearing transaction, a check clearing transaction, an account charging transaction, a charge-back transaction, *and*

an account settling transaction." (*Id.,* Claim 148).

Plaintiffs urge that the disputed phrase, when used in connection with a list of items (which is the way it is used in the patent in suit) means, "Only one item from the list or any combination of items in the list." Using the phrase, "At least one of A, B and C," as an example, plaintiffs say the claim means only A, or only B, or only C, or any combination of A, B and C.

Defendants argue that the phrase means, "One or more of each of the items contained in the list." Using the same example, defendants contend that the phrase, "At least one of A, B and C," means, "One or more of A, one or more of B, and one or more of C."

I construe the phrase "at least one of . . . and . . ." in connection with a list of items to mean, "One or more of one or more of the items contained in the list."

If I were to look only to the plain meaning of the language, defendants would be indisputably correct. This is a simple matter of good English grammar (admittedly, a lost art). According to William Strunk, Jr. and E.B. White's classic authority on grammatical construction, THE ELEMENTS OF STYLE, 27 (4th ed.2002), "An article of a preposition applying to all the members of the series must either be used only before the first term or else be repeated before each term." Here, the preposition "of" (or, rather, the phrase "one of") appears only before the first term in the sequence. It thus applies to every individual term that follows—to A, and to B, and to C. Or, to put it in the context of the claims in suit, the phrase "at least one of a clearing transaction, a check clearing transaction, an account charging transaction, and a charge-back transaction" means at least one of each kind of transaction. The construction favored by plaintiffs would, as a matter of proper grammar, read, "at least

one of a clearing transaction, a check clearing transaction, an account charging transaction, *or* a charge-back transaction." Use of the disjunctive preposition "or," rather than the additive preposition "and," makes a tremendous difference if all I care about is the grammatically correct construction of the phrase.

Use of the grammatically correct interpretation of the disputed language—which I will call the "plain meaning" of the language—was endorsed by the Federal Circuit in the recent case of *SuperGuide Corporation v. DirecTV Enterprises, Inc.,* 358 F.3d 870, 885 (Fed.Cir.2004). Applying an Occam's Razor approach to claim construction, I am tempted to follow suit.

However, in *SuperGuide,* interpreting the phrase in the grammatically correct fashion made sense in the context of the patent specifications. Reading the phrase in the same way here would render the claims utter nonsense.

Take again the phrase, "wherein the banking transaction is at least one of a clearing transaction, a check clearing transaction, an account charging transaction, and a charge-back transaction." A single banking transaction cannot be all four, so reading the disputed phrase additively—while grammatically correct— means it does not make any sense. That suits defendants' purposes nicely, of course, but it does not comport with the rules for proper claim construction.

One of the things I have learned in my brief but intensive introduction to patent law is that plain English grammar and syntax are not always endorsed by either patent examiners or courts interpreting patents. My personal favorite example of this phenomenon is the word "one," which in plain English means "one and no more than one" but which in patent English means "one or more than one," or "at least

one." I do not understand why this is so, but I know that it is so, and I have applied that principle on more than one occasion—indeed, I will apply it again later in this opinion. So I accept the proposition that it is perfectly proper to ignore English grammar and syntax when interpreting patent claim language—at least, when context renders a different reading more sensible.

Here, it is far more sensible to read the disputed phrase as though plaintiffs had used the word "or" in place of "and." Indeed, that is what plaintiffs do in the specifications. They substitute either the word "or" or the phrase "and/or" for the word "and" every time they describe an embodiment of the claim. For example, despite phrasing their claims as "at least one of a checking account, a savings account and an ATM account," they state, "FIG. 4 illustrates a block diagram of an alternate embodiment of the apparatus of the present invention which is utilized in conjunction with a checking account, savings account and/or ATM account and/or transaction (hereinafter referred to as a 'banking transaction.')." '725 patent, col. 20, line 63—col. 1, line 10. Or, despite the use of the word "and" in the phrase "at least one of a clearing transaction, a check clearing transaction, an account charging transaction, and a charge-back transaction," the specifications state, "The apparatus and method of the present invention may be utilized to obtain account owner authorization in a banking and/or financial transaction." The specification continues in this vein, making repeated references to "a savings account or a checking account number," "determin[ing] the status of the account" and "the transaction," as in "...the account owner may either utilize the reply or two-way pager feature on the communication device 104 in order to either approve or authorize the transaction or disapprove of, or void, the transac-

tion."(the relevant portions of the specification are found at col. 24, line 49—col. 28, line 5).

Ironically, *SuperGuide* offers further support for adopting the ungrammatical but sensible reading of the disputed phrase. In that case, the disputed phrase was "at least one of selection and storage of program start time, program end time, program service and program type." In the first instance, the Federal Circuit concluded that the grammatically correct reading of the phrase " at least one of....and...." " was the "plain and ordinary meaning of the disputed language." *SuperGuide, supra,* 358 F.3d at 885. But the court then looked to the specification, to see if anything therein "rebuts the presumption that the patentee intended the plain and ordinary meaning of the language." *Id.,* at 887. What it learned from the specification was that, "Every disclosed embodiment teaches that the user must choose a value for each designated category," and that Figure 4a—the only Figure in the specifications that explains how transmitted schedule information is stored—likewise showed that the system's user had to choose at least one value for each designated criterion. *Id.*

I agree with defendants that the plain meaning of the language is conjunctive, not disjunctive. But when I go on to test that proposition by referring to the specifications—as I must, under the teaching of *Hoechst Celanese, supra,* 78 F.3d at 1578—it becomes clear that the patentee did not intend to use the phrase in its plain and ordinary way. Rather, the language used in the specifications is either disjunctive ("or") or both conjunctive and disjunctive ("and/or"). And unlike Figure 4a in *SuperGuide,* Figure 4 in the '725 patent plainly diagrams a transaction that supports a disjunctive, rather than conjunctive, reading of the relevant term. In

short, the specification rebuts the presumption that the language should be given its plain and ordinary meaning.

Therefore, in the context of the '725 patent, I define the phrase "at least one of. . . and. . ." in connection with a list of items to mean "one or more of one or more of the items contained in the list." I hasten to add that this definition is adopted solely to square the claim language in the '725 patent with the patent's specifications. Thus, this decision has absolutely no precedential value for any other patent.

## B. "Receiver"

■■■ "Receiver" is construed to mean, "A device for receiving signals or data from an outside source and converting those signals or data to usable form."

Defendants urge that the term be construed in accordance with the definition that appears in the relevant technical dictionary, MCGRAW-HILL DICTIONARY OF SCIENTIFIC AND TECHNOLOGICAL TERMS, 1759 (6th ed.2003). In connection with the field of electronics, which for our purposes appears the most germane of the fields listed, that source defines a "receiver" as:

The complete equipment required for receiving modulated radio waves and converting them into original intelligence, such as into sounds or pictures, or converting to desired useful information as in a radar receiver.

Plaintiff argues that defendants' construction is too limiting, because the term "receiver" is used to cover different sorts of devices in different parts of the patent. Indeed, plaintiff urges that the '725 patent discloses at least nine receivers in nine separate elements.

Plaintiffs' proposed definition, however—"A device that can receive something"—is almost ridiculously overbroad, not to mention tautological. Defendants are correct that this definition fails to provide the court with any elucidation of the intended scope of the term.

A review of the relevant specifications contains no indications that plaintiffs did not intend for receiver to have its ordinary meaning.

I choose to modify the MCGRAW-HILL definition by eliminating its unnecessary and confusing references to radio and radar. Plaintiffs' patent clearly contemplates the use of computers and computer terminals; indeed, the specifications indicate that the receiver is to receive signals and/or data from a "central processing computer." Radar has nothing whatever to do with the sort of "receiver" contemplated here.

## C. "Communication Device"

■■■ "Communication device" is defined as, "An apparatus for the transmission of intelligence between two or more points." This definition accurately summarizes what a communications device would do—it would communicate, by transmitting data.

Plaintiffs' proposed definition is, "A device having a receiver and a transmitter, or a device having a receiver, or a device having a transmitter." In other words, plaintiff defines a "communication device" as a receiver, or a transmitter, or a device that contains both a receiver and a transmitter. Plaintiff obviously takes this tack because its specifications designate a computer as the "device" that "communicates"—and computers "communicate" with other computers.

But plaintiffs' disjunctive definition cannot possibly be correct, because it defines a "device having a receiver" (but no transmitter) as a "communications device." A bare receiver (i.e., a device that can receive data, but not transmit data) cannot possibly be a "communications device," because "communication" requires the trans-

mission of data. "Communicate" comes from the Latin word "communicare," which means "to impart." In the common parlance, the word is defined as, "To convey knowledge of or information about, to make known." WEBSTER'S NEW COLLEGIATE DICTIONARY, 228 (1977 ed.). In scientific and technical parlance, "communication" means, "The transmission of intelligence between two or more points..." MCGRAW-HILL DICTIONARY OF SCIENTIFIC AND TECHNOLOGICAL TERMS, *supra*, at 440. Both definitions comprehend the sending or imparting of data. A bare receiver cannot send or impart data. It can only accept data. Therefore, it cannot be a "communications device."

It is equally clear from the specifications that a bare receiver cannot be a "communication device" for purposes of the '725 patent. Here is how the contested language appears in context:

[W]herein the limitation or restriction is transmitted to a receiver from a communication device associated with an individual account holder. '725 patent, col. 48, line 29–31.

In this patent, in these claims, the communications device sends data (in the form of a limitation or restriction) to a receiver. Thus, in the context of the claims in suit, the communications device is the sending device, and the receiver is the receiving device. If a communications device could be "a device having a receiver" (but no transmitter), it would be incapable of "transmitt[ing] to a receiver." Thus, in the context of the claims in suit, the communications device cannot possibly be a bare receiver. It must, therefore, either be a transmitter, or be something that contains a transmitter.

I hasten to add that nothing in the definitions of "receiver" and "communication device" that I adopt rules out a computer or other input/output (I/O) device as being either a "receiver" or a "communications device."

### D. "Central Processing Device"

■ "Central Processing Device" is construed as "That part of a computer containing the circuits required to interpret and execute instructions."

This definition, propounded by defendants, is found in the MCGRAW-HILL DICTIONARY OF SCIENTIFIC AND TECHNOLOGICAL TERMS, 356 (6th ed.2003). It meets the first rule of patent construction—that the plain meaning of a term shall be used to define it.

This definition is also consistent with plaintiffs' use of the term throughout the patent. For reasons that are not entirely clear to this Court, plaintiffs use this term interchangeably with the more common "central processing unit" (CPU) and with the term "central processing computer." Indeed, in most instances, plaintiffs use the word "unit" or "computer" rather than "device." For example, the illustrations in Figures 1, 4, 7, and 11 of the '725 patent include "central processing computers." Figure 8 depicts three "CPU's." The "SUMMARY OF THE INVENTION" refers repeatedly to a "central processing computer." '725 patent, col. 3–12. The "DESCRIPTION OF THE PREFERRED EMBODIMENT" section refers repeatedly to various "central processing units" and "central processing computers." *Id.*, col. 12–44. In fact, the first time this Court sees mention of a "central processing device" is in a subsection of the "DESCRIPTION OF THE PREFERRED EMBODIMENT" section describing the patent claims, at column 46, line 12.

In any event, "device" and "unit" strike me as essentially equivalent, and my intuition is borne out by the DICTIONARY OF SCIENTIFIC AND TECHNOLOGICAL TERMS, p.

226, which defines "unit" as, "An assembly or *device* capable of independent operation, such as a . . . computer subassembly that performs some inclusive operation or function." The interpretation and execution of instructions is most certainly an "inclusive operation or function."

Defendants' proposed definition also comports with the definition of the term "processing" that was stipulated by the parties. Both sides agree that "processing" means "operating on data or information, or to perform a series of actions or operations directed toward a particular result." A processing "device" is, therefore, something that accomplishes "processing" as defined by the parties. In a computer, that device is the "central processing unit."

Defendants' effort to further limit the definition by suggesting that the word "central," as used in the phrases, "central processing device" or "CPU," is somehow analogous to the word's use in the phrase "central computer means" that was the subject of discussion in *British Telecommunications v. Prodigy Communications,* 189 F.Supp.2d 101, 112–13 (S.D.N.Y.2002), is misplaced. First, that case involved a "means plus function" claim, which is manifestly not the case here. Second, nothing whatever in the specifications suggests the existence of some central computer or bank of computers, as was the case in *British Telecom.*

Plaintiffs' effort to broaden the definition beyond the one proposed by defendants is equally misguided. "Something that processes something" defines nothing. In connection with this *Markman* proceeding, I have processed a great deal of information. That does not mean that the term "central processing device" as used in the '725 patent could be read onto my brain.

### E. *"Signal"*

 "Signal" means, "A visual, aural or other indication used to convey information."

Defendants' proposed definition of "signal"—which I accept—also comes from the DICTIONARY OF SCIENTIFIC AND TECHNOLOGICAL TERMS, page 1929. The dictionary definition captures the plain meaning of the word and encapsulates precisely what a signal is. The word "signal" is quite common in our language, and there is not the slightest indication in the specifications that plaintiff intended anything other than the word's plain and ordinary meaning. Indeed, the dictionary definition is completely consistent with the repeated use of the word "signal" in the 61 pages of quotations from the '725 patent. I cannot imagine what else the word could mean—in any of the quoted passages—if it did not mean what the dictionary says it means.

Plaintiffs' proposed definition, "Something having information," is not only vague and uninformative, but wildly overbroad. Lots of things have information but are not signals. A book has information; a book is not a signal. The periodic table of elements has information; the periodic table is not a signal.

Plaintiffs' proposed alternative definition, "An indication having data, information, and/or a message, and/or an indication conveying data, information, and/or a message," when parsed (or "deconstructed," as English scholars would put it), is nothing more than a complicated and inelegant way of rephrasing the dictionary definition's spare, non-redundant prose.

Plaintiffs' complaint that the dictionary definition is "too limiting in light of the manner in which Plaintiffs have used the term throughout the specification" is unpersuasive. For example, plaintiffs contend that the word "signal" corresponds to

a "transaction." If plaintiffs are suggesting that the word "signal" equates to the word "transaction," then they are simply talking nonsense. "Signal" does not mean "transaction" in either common or technical parlance. If, on the other hand, they are saying that there exists a signal corresponding to a particular transaction which is, in fact, what the claim says—"a processing device for processing the transaction information and for generating a first *signal* corresponding to the transaction"— then I fail to understand plaintiffs' objection, since there is no necessary inconsistency between the dictionary definition of "signal" and the fact that a particular signal would correspond to a particular transaction. The "visual, aural or other indication"—the "signal"—would "convey information" about a particular transaction. That appears to be the way the word is used in the specifications highlighted by plaintiffs.

### F. "Hold"

██ The term "hold" in the context of the '725 patent means, "A notation limiting access to funds in a checking, savings or automated teller machine account."

This term appears in the claims as follows:

Wherein the central processing device determines whether a *hold* for prohibiting a withdrawal is placed on at least one of a checking account, a savings account, and an automated teller machine account, and further wherein the central processing device disallows the banking transaction. (Claims 135 and 164).

Plaintiffs would have this court construe the term "hold" as "something that prohibits something from happening." Again, the proposed definition is insufficiently specific to connote anything remotely related to the patent in suit.

Noting that the invention relates to banking, defendants point out that the term "hold" is a term of art in the banking industry. The construction it proposes comes directly from the BARRONS' BUSINESS GUIDE, DICTIONARY OF BANKING TERMS (4th ed.2000):

"A notation limiting an account owner's access to his or her funds."

Plaintiff protests that this definition is too restrictive—even though it would qualify as the "plain and ordinary meaning" of the word to anyone familiar with the banking industry—because their invention is intended to be used by the owner of an account to prevent others from obtaining access to his or her funds. *See* '725 Patent, "BACKGROUND OF THE PRESENT INVENTION," at Col. 2, line 60–Col. 3 line 35.

The confusion arises because the person not skilled in the art of banking thinks about a "stop payment" order very differently than a banker does. When the average person writes a check to someone and then directs the bank to stop payment on it, he naturally is trying to prevent the person holding the check from getting at the account owner's money. But to a person skilled in the art of banking, when a check is presented for payment, it is the owner of the account who is trying to access his own money. He is trying to access it so that it can be remitted to some third party. The check, written and signed by him, is the method by which he accesses his funds. If at some point he changes his mind, the owner of the account directs the bank to stop payment on the check. As far as the bank is concerned, the stop payment order limits the owner's ability to access the funds in his account by negating the owner's prior instruction (via the check) that the funds should be accessed.

It seems clear that plaintiffs contemplate that their invention will be used for something in addition to the traditional "stop payment"—specifically, that an account owner will utilize it to prevent a third party from making an unauthorized withdrawal from the owner's account, most likely from an ATM machine. The unauthorized withdrawal could be innocuous, as when a child tries to use his parents' ATM card to withdraw more money from his parents' account than the parent will allow (this assumes, of course, that there are parents so foolish as to permit their children to use their ATM cards). Or it could be pernicious, as when an identity thief or computer hacker uses a fraudulent ATM card or stolen account numbers to try to empty the owner's account. In either event, the initiator of the transaction is not the account owner—a fact that differentiates these situations from the more common "stop payment" on a check. And it appears to me that plaintiff is using the common banking word "hold" to apply to these uncommon—potentially criminal—transactions.

By omitting the modifier "account owner's" before the word "access" in defendants' proposed definition, we solve this problem and allow the word to make sense in all the contexts in which plaintiffs use it in their patent.

### G. "Banking Transaction"

 I define the last disputed term, "banking transaction," as follows: "An activity affecting a deposit account, such as a deposit of funds or a withdrawal."

Again, plaintiffs propose a definition that is vague and overbroad—"Something carried out or performed with a bank." Defendants' proposed definition, "An activity affecting a deposit account, such as a deposit of funds or a withdrawal, carried out at the request of the account owner," hits closer to the mark, no doubt because that is the definition of "banking transaction" found in the DICTIONARY OF BANKING TERMS. The only problem with the definition is that, as used in the '725 patent, the term "banking transaction" can mean a transaction authorized by the account owner or one that is not authorized by the account owner. The DICTIONARY OF BANKING TERMS limits the definition to an owner-authorized transaction. Such a limitation does not work in connection with this particular patent, which is designed to allow a customer to stop not just transactions that he authorized but has had second thoughts about, but also transactions that he has not authorized, but that are occurring because someone other than the owner has obtained access to the owner's account. In this day and age, where information and identity theft is rampant, it would be foolish to pretend that banking transactions cannot be initiated—and sometimes completed—by persons other than account owners. The use of the term "banking transaction" throughout the '725 specifications contemplates the possibility of unauthorized banking transactions. Therefore, the DICTIONARY OF BANKING TERMS definition is too restrictive.

Again, there is an easy fix. Placing a period after the word "withdrawal" in the DICTIONARY OF BANKING TERMS definition, and eliminating the phrase, "Carried out at the request of the account owner," solves the problem while casting the definition in terms that are familiar to one skilled in the art of banking.

### CONCLUSION

This concludes the Markman phase of this proceeding. The parties are directed to report for a conference on Friday, December 10, 2004, at 10:30 a.m. so the Court can enter a further scheduling order.