### TOUCHTUNES MUSIC CORP., Plaintiff,

v.

### ROWE INTERNATIONAL CORP., Arachnid, Inc., AMI Entertainment, Inc. and Merit Industries, Inc., Defendants.

No. 07 Civ. 11450.

United States District Court, S.D. New York.

July 22, 2010.

Kaye Scholer LLP by James S. Blank, Esq., New York, NY, Nixon & Vanderhye, P.C. by Joseph S. Presta, Esq., Jonathan T. Reavill, Esq., Arlington, VA, for Plaintiff TouchTunes Music Corp.

McAndrews, Held & Malloy, Ltd. by James P. Murphy, Esq., Paul W. McAndrews, Esq., Chicago, IL, for Defendant Arachnid, Inc.

## OPINION

SWEET, D.J.

Plaintiff Touchtunes Music Corporation ("Touchtunes") brings this patent infringement action seeking a declaratory judgment of noninfringement and invalidity of six patents owned by Defendant and Counterclaimant Arachnid, Inc. ("Arachnid"). In its Answer and Counterclaims, filed on February 15, 2008, Arachnid counterclaimed that Touchtunes infringed four of these six patents, U.S. Patent Nos. 5,848,-398 (the "'398 Patent"), 6,381,575 (the "'575 Patent"), 6,397,189 (the "'189 Patent"), and 6,790,834 (the "'834 Patent"). Arachnid added a fifth patent, U.S. Patent No. 6,191,780 (the "'780 Patent"), to its infringement counterclaims in its Amended Answer and Counterclaims, filed on May 14, 2010, but no claims from the '780 patent have been presented for construction. Currently at issue are claims 1, 2, 8, and 9 of the '398 Patent; claims 1–6, 9–11, 15, and 21–25 of the '575 Patent; claims 1–8, 10, and 11 of the '189 Patent; and claims 1–7, 9–15, and 17 of the '834 Patent (collectively, the "claims-in-suit").

Pursuant to *Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996), the parties submitted briefing regarding their proposed construction of disputed claim terms. After conferences between the parties, a *Markman* hearing was held on March 23, 2010.

The Court's construction of the disputed claim terms is set forth below.

## I. PRIOR PROCEEDINGS

On December 20, 2007, Touchtunes filed its complaint alleging that Defendants Rowe International Corp. ("Rowe"), AMI Entertainment, Inc., and Merit Industries, Inc. (collectively, the "Rowe Defendants") infringed several of Touchtunes' U.S. Pat-

ents and seeking a declaratory judgment. Touchtunes also sought a declaratory judgment of noninfringement and invalidity of six patents owned by Arachnid. On February 15, 2008, Arachnid counterclaimed that Touchtunes infringed four of these six patents and, on May 14, 2010, added a fifth patent to its counterclaims.

In or about April 2009, Touchtunes and the Rowe Defendants entered into a settlement agreement, pursuant to which Touchtunes' affirmative claims against the Rowe Defendants and its declaratory judgment action against Rowe were both dismissed.

On March 19, 2010, Touchtunes filed a motion for summary judgment and oral argument was heard on May 26, 2010. The resolution of Touchtunes' summary judgment motion remains *sub judice*.

On March 23, 2010, the Court held a *Markman* hearing to address issues of construction of certain terms of the claims-in-suit.

## II. THE FACTS

The relevant facts are set forth in the parties' opening and responsive claim construction briefs.

The patents at issue in this case each relate to "computer jukeboxes," the latest generation of jukeboxes. Certain of these patents are directed to the display of downloaded advertisements on these computer jukeboxes, while the others are directed to the operation of the computer jukeboxes in a "user attract mode" intended to attract patrons.

## III. THE LEGAL FRAMEWORK AND APPLICABLE STANDARD

■ Claim construction is an issue of law to be determined by the court. *Markman*, 517 U.S. at 385, 116 S.Ct. 1384. In interpreting the meaning of claim terms, "words of a claim 'are generally given their ordinary and customary meaning'" as understood by "a person of ordinary skill in the art at the time of invention, *i.e.*, as of the effective filing date of the patent application." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed.Cir.2005) (en banc) (citations omitted). The court reads a claim term "not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* at 1313.

The Federal Circuit has emphasized the importance of "intrinsic" evidence in claim construction: the words of the claim themselves, the written description in the patent's specification, and, when necessary, the history of the patent application's prosecution before the U.S. Patent and Trademark Office (the "PTO"). *Id.* at 1314–17.

The process of claim construction begins with the language of the claims themselves, which the patentee selected to "'particularly point [ ] out and distinctly claim [ ] the subject matter which the applicant regards as his invention.'" *Id.* at 1311–12 (quoting 35 U.S.C. § 112, ¶ 2). Thus, "the claims themselves provide substantial guidance as to the meaning of particular claim terms." *Id.* at 1314. In addition to the particular claim being examined, the context provided by other claims may be helpful as well. *Id.*

■ Claim language must also be read in the context of the specification. *Id.* at 1315. The specification "is always highly relevant to the claim construction analysis. Usually it is dispositive; it is the single best guide to the meaning of a disputed term." *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed.Cir.1996)). When the patentee "act[s] as his or her own lexicographer" and includes an explicit definition of a claim term in the specification, that definition is dispositive. *Id.* at 1319 (citation omitted). The specification also acts as a dictionary "when it defines terms by impli-

cation." *Vitronics,* 90 F.3d at 1582. However, when relying on the specification to interpret claim terms, a court should not be confined to the embodiments described in the specification. *Phillips,* 415 F.3d at 1323. The mistake of "reading a limitation from the written description into the claims" is "one of the cardinal sins of patent law." *Id.* at 1320 (quoting *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.,* 242 F.3d 1337, 1340 (Fed.Cir. 2001)).

■ Courts may also utilize the prosecution history, which "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.* at 1317 (citations omitted). However, the prosecution history "often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.*

■ Finally, courts may rely on "extrinsic" evidence such as dictionaries, learned treatises, and expert testimony, which may serve as a source of "accepted meaning of terms used in various fields of science and technology" or provide "background on the technology at issue." *Id.* at 1317–18. However, such extrinsic evidence is "less significant than the intrinsic record in determining the legally operative meaning of the claim language." *Id.* at 1317 (internal citations and quotation marks omitted). Extrinsic evidence may not be used to contradict the meaning of the claim terms as evidenced by the intrinsic evidence. *Id.* at 1317–19; *see also Biagro W. Sales, Inc. v. Grow More, Inc.,* 423 F.3d 1296, 1302 (Fed.Cir.2005).

Limitations presented in the "means-plus-function" format "must be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof" for performing the claimed function. *Lockheed Martin Corp. v. Space Sys./Loral, Inc.,* 324 F.3d 1308, 1318 (Fed.Cir.2003); *see* 35 U.S.C. § 112, ¶ 6.

■ In construing a means plus function limitation, a court must first identify the claimed function and then identify the corresponding structure disclosed in the written description that performs that function. *See Applied Med. Res. Corp. v. U.S. Surgical Corp.,* 448 F.3d 1324, 1332 (Fed.Cir.2006); *JVW Enters., Inc. v. Interact Accessories, Inc.,* 424 F.3d 1324, 1330 (Fed.Cir.2005). When identifying the claimed function, a court may not construe the function "by adopting a function different from that explicitly recited in the claim." *JVW,* 424 F.3d at 1331 (internal quotations marks and citation omitted). Once the function is properly identified, a court examines the patent's specifications to identify the structure that corresponds to the claimed function. *See Applied Med.,* 448 F.3d at 1332. "Under this second step, 'structure disclosed in the specification is "corresponding" structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim.'" *Med. Instrumentation & Diagnostics Corp. v. Elekta AB,* 344 F.3d 1205, 1210 (Fed.Cir. 2003) (citation omitted). If no structure for performing the claimed function is disclosed, the claim is invalid for indefiniteness. *See, e.g., Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.,* 296 F.3d 1106, 1114 (Fed.Cir.2002).

## IV. THE DISPUTED LIMITATIONS

The parties dispute the definition of the following claim terms: "computer jukebox," found in all claims; "user attract mode," found in claims 1–6, 15, and 21–25 of the '575 Patent and claim 4 of the '189 Patent; "graphics," found in claims 4, 6, 11, 21, and 25 of the '575 Patent and

claims 3 and 4 of the '189 Patent; "selection keys," found in all claims of the '189 Patent; "song selector," found in claims 1–6, 15, and 21–25 of the '575 Patent; "a song selection means displayed on said visual screen, actuable by a user for retrieving and playing a signal representing a song selected from a plurality of songs stored in said jukebox," a means-plus-function limitation found in claims 1 and 2 of the '398 Patent; "a programmable memory storing said song data representing the plurality of songs, said programmable memory also storing said advertisement data representing the at least one advertisement," found in claims 3–7 and 9 of the '834 Patent; "said data storage unit having a song storage location storing song data and an advertisement storage location receiving advertisement data," found in claims 3–7 and 9 of the '834 Patent; "said advertisement data includes at least one time for said at least one advertisement to be run," found in claims 10–15 and 17 of the '834 Patent; "data representing when and the number of times each of said advertisements is to be run," found in claims 1 and 2 of the '834 Patent and all claims of the '398 Patent; "a number of times and when said at least one advertisement is to be run by said computer jukebox," found in claim 7 of the '834 Patent; "the song record including song identity data comprising at least one of a song title, a song category, song address, song size, graphics address, graphics size, and play count," found in all claims of the '575 Patent; and "adapted for," found in claims

1–6, 9–11, 15, and 21 of the '575 Patent and all claims of the '189 Patent.

### A. "computer jukebox"

In its responsive brief, Arachnid accepts Touchtunes' proposed definition of "computer jukebox" as "a stand-alone unit operable solely by a patron, including a money intake unit, that plays and is capable of playing songs, as that term is used herein." Since this claim term is no longer disputed, the term is given Touchtunes' proposed definition.[1]

### B. "user attract mode"

██ The parties agree that the term indicates a mode "in which graphics are displayed to attract users to the jukebox," but disagree as to when the jukebox is in this mode. Touchtunes proposes that this mode is "triggered by a determination that no song selection is playing on the jukebox," whereas Arachnid proposes that the jukebox is in user attract mode "when the jukebox is not in selection mode."

Touchtunes' proposed construction seeks to introduce a "triggering" element into the claim, although the term "trigger" does not appear in any Arachnid patent. To support its proposed construction, Touchtunes relies on a preferred embodiment which states that, "if no song selection is playing, the processing circuit 121 operates in a user attract mode" and "[i]f, however, a song selection is being played when the block 161 is encountered, the

---

1. The parties agreed that the term "song" is construed as a "studio-quality musical recording." (See Arachnid Br. 7.) In its responsive brief, Arachnid has asserted that "the parties now agree that 'songs' are 'musical recordings,'" suggesting that the term "studio-quality" had been dropped from the definition. (Arachnid Resp. 2.) Touchtunes challenged this assertion during the *Markman* hearing and in its motion for summary judgment, which turns on the definition of "studio-quali-

ty." In response to Touchtunes' summary judgment motion, Arachnid filed a Supplemental Claim Construction Memorandum on March 22, 2010, in which it challenges Touchtunes' definition of "studio-quality" and proposes its own construction for "song." The arguments presented in Arachnid's Supplemental Claim Construction Memorandum will be addressed in the resolution of Touchtunes' summary judgment motion.

attract mode sequencing does not occur." '575 Patent at 6:39–59. However, the description of the preferred embodiment is the converse of Touchtunes' characterization. Rather than being "triggered," the user attract mode automatically occurs unless a song selection is being played.

 Touchtunes' proposed construction is also incorrect because, by incorporating the concept that user attract mode is triggered by a determination that no song is playing, it renders superfluous the phrase "when no song is playing on the jukebox," as recited in claim 4 of the '189 Patent and claim 6 of the '575 Patent. A claim construction that renders claim language superfluous is almost always incorrect. *See Stumbo v. Eastman Outdoors, Inc.*, 508 F.3d 1358, 1362 (Fed.Cir.2007).

Arachnid's proposed construction is consistent with the plain meaning of the term: it is a mode to attract users to the jukebox that is exited when the user "uses" the jukebox by making a song selection.

The term "user attract mode" is therefore construed to mean "a mode, when the jukebox is not in selection mode, in which graphics are displayed to attract users to the jukebox."

### C. "graphics"

 Touchtunes proposes that "graphics" be construed as "images on a computer screen." Arachnid seeks to define the term as "pictorial images created from image files."

The patents disclose both "graphics" and "pictorial graphics." As a matter of plain language, the term "pictorial graphics" describes a subset of the broader term "graphics," and therefore has a narrower meaning. Without any basis in the intrinsic record, Arachnid seeks to eliminate the distinction between these two terms, effectively proposing that the term "pictorial" be considered superfluous and that the narrower meaning of "pictorial graphics"

be applied to the more general term "graphics" throughout the patents. The use of the term "pictorial graphics" means that "graphics" are not necessarily pictorial. *See Phillips*, 415 F.3d at 1314 (use of the term "steel baffles" "strongly implies that the term 'baffles' does not inherently mean objects made of steel"). Similarly, Arachnid's proposed restriction of graphics to "images created from image files" finds no support in any of the patents.

Consistent with the ordinary meaning of the claim term and the intrinsic evidence, "graphics" are therefore construed as "images on a computer screen."

### D. "selection keys"

 Touchtunes proposes that the term "selection keys" be construed as "mechanical buttons that allow a user to select a song," emphasizing that the keys are separate from the non-mechanical "display" of the jukebox. Arachnid, on the other hand, proposes that the term be construed as "keys that allow a user to select a song."

Because there is no dispute regarding the construction of the term "selection," Touchtunes argues that the proper construction of the term "keys" is essential and that Arachnid's proposed definition fails because it is circular, defining keys as "keys." To support its proposed construction, Touchtunes cites selected dictionary definitions that define keys as mechanical buttons. While these definitions conform to Touchtunes' proposed construction, they do not reflect the ordinary meaning of the word "key." For example, *Webster's* defines "key" as "a small switch for opening or closing an electric circuit," with no reference to any "mechanical" quality. *Merriam Webster's Collegiate Dictionary* 640 (10th Ed.1993).

Touchtunes also relies on the separate recitation of "selection keys" and "display"

in the '189 Patent specifications. It argues that merging the display and keys would make both terms redundant. *See Unique Concepts, Inc. v. Brown*, 939 F.2d 1558, 1561–62 (Fed.Cir.1991). However, nothing about the separate recitation suggests or requires that the keys be mechanical. Moreover, this separation does not preclude the possibility that selection keys can be on a visual screen. Touchtunes' reliance on the preferred embodiments shown in the specification is improper, as it is impermissible to limit the claim term to specific preferred embodiments shown in the specification. *See Phillips*, 415 F.3d at 1323.

Finally, Touchtunes argues that the Court should consider the accused products: Touchtunes jukeboxes use a "touchscreen" computer display for the selection songs, whereas Arachnid's patents do not disclose a touchscreen. Although consideration of the accused products may provide meaningful context, "[a] court may not use the accused products for the sole purpose of arriving at a construction of the claim terms that would make it impossible for the plaintiff to prove infringement." *Every Penny Counts, Inc. v. American Express Co.*, 563 F.3d 1378, 1383 (Fed.Cir. 2009).

Nothing in the intrinsic record requires that "keys" be "mechanical" or separate from the visual display. The term "selection keys" is therefore given its plain and ordinary meaning and construed as "keys that allow a user to select a song."

### E. *"song selector"*

As with "selection keys," Touchtunes proposes a construction of the term "song selector"—"a mechanical device, separate from a display, that allows a user to select a song"—that adds "mechanical" and "separate" requirements. Arachnid proposes a more general construction: "a device that allows a user to select a song."

Touchtunes again contends that the separate recitation of the terms "display" and "song selector" in the '575 Patent supports the limitations it seeks to impose. However, this separate recitation in a specific preferred embodiment does not require physical separation between the "song selector" and the display screen, nor does the fact that the '575 Patent discloses keys and a keyboard as the selection devices in the preferred embodiments limit the claim term to "mechanical" devices. *See Phillips*, 415 F.3d at 1323.

For these reasons, consistent with its plain and ordinary meaning, the term "song selector" is construed as "a device that allows a user to select a song."

### F. *"a song selection means displayed on said visual screen, actuable by a user for retrieving and playing a signal representing a song selected from a plurality of songs stored in said jukebox"*

The parties agree that this disputed claim term is written in a special form known as "means-plus-function." The first step of a means-plus-function analysis is to construe the claimed function. *See Applied Med. Res. Corp.*, 448 F.3d at 1332. The second step is to determine if the specification discloses corresponding structure as performing the recited function. *Id.*

Touchtunes contends that the claimed function is "retrieving and playing a signal representing a song selected from a plurality of songs stored in said jukebox, the song being selected by a user actuating the visual screen." Arachnid argues that this misstates the function, because it ignores the function of displaying on the visual screen and imports the ambiguous term "actuating" into the claim. Instead, Arachnid proposes that the function is "displaying a plurality of songs and allowing

retrieving and playing a signal representing a particular song."

Arachnid's construction of the function improperly eliminates the claim's requirement that the song be retrieved and played by actuation of means "displayed on said visual screen." Moreover, the claim does not recite the function of "displaying a plurality of songs," as Arachnid proposes. Accordingly, the Court agrees with Touchtunes' construction of the function.

Turning to the second step, the only structure disclosed in the patent for retrieving and playing song selections are the selection keys/keyboard 123. '398 Patent 7:44–52. Figure 1 of the '398 Patent clearly shows that the keyboard 123 is separate from the display and therefore not actuable through the visual screen. Pursuant to 35 U.S.C. § 112, ¶ 6, for means-plus-function claim terms a corresponding structure must be identified in the specification and must be clearly linked or associated to the function recited in the claim. *Med. Instrumentation & Diagnostics*, 344 F.3d at 1210.[2] Here, the patent lacks the required disclosure of corresponding structure for a user-actuated visual screen.

Since the specification fails to disclose a structure that corresponds to the function in this means-plus-function claim, the claim is indefinite and therefore invalid. *See Cardiac Pacemakers*, 296 F.3d at 1114.

**G. "a programmable memory storing said song data representing the plurality of songs, said programmable memory also storing said advertisement data representing the at least one advertisement"**

 Arachnid contends that there is no dispute that the memory in this term stores songs and data, and that therefore the plain and ordinary meaning of "programmable memory" is "computer memory that can be programmed." Touchtunes challenges this proposed construction, arguing that it ignores the requirement that a programmable memory "store both said song data and said advertisement data." (Touchtunes Resp. 12.) Touchtunes therefore proposes the following construction: "A computer storage device that stores both said song data and said advertisement data."

Arachnid takes issue with Touchtunes' use of the term "device" to restrict the claim term to a single physical piece of equipment, contending instead that the programmable memory is not required to be in a single place or serve a single function, because the claim term uses the indefinite article "a" to qualify "programmable memory." *See Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342–43 (Fed.Cir.2008) (observing that "an indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more' "). However, the plain language of the disputed claim term makes it clear that the same programmable memory storing said song data must also store said advertisement data, because "said programmable memory" necessarily refers back to the "a programmable memory" recited earlier in the claim. *See, e.g., Intamin, Ltd. v. Magnetar Tech. Corp.*, 483 F.3d 1328, 1333 (Fed.Cir.2007) (use of the word "said" in a claim refers to an earlier use of that term in the claim). While the *Baldwin* case cited by Arachnid acknowledged the rule that "a" and "an" mean "one or more" and also held that the subsequent use of "the" or "said" does not change the potentially

---

2. While the term "selection keys" in the '198 Patent was not limited by specific preferred embodiments described in the specifications, the rules of construction for means-plus-function claim terms require a different analysis. If no corresponding structure is specifically disclosed in the specification, the claim is invalid.

plural nature of the "one or more" structures claimed, 512 F.3d at 1342–43, it does not hold that a limitation requiring "said" structure to perform two tasks could be satisfied by splitting those tasks among multiple structures. Here, at least one programmable memory must itself store song data while "also storing said advertisement data" to satisfy the express limitation in the claim.

Arachnid relies on an opinion from a case in the Northern District of Illinois, in which the Honorable Matthew F. Kennelly rejected a construction of this same term that limited programmable memory to a "particular type of memory." *Rowe Int'l Corp. v. Ecast, Inc.*, No. 06 C 2703, 2008 WL 5100319, at *2 (N.D.Ill. Nov. 28, 2008). In this case, however, Touchtunes does not seek to limit the term to a particular type of memory or challenge the notion that a programmable memory is a "computer memory that can be programmed," but rather it argues that the term requires both song data and advertisement data to be stored in the same programmable memory.

For the foregoing reasons, the Court adopts Touchtunes' proposed construction.

### H. "said data, storage unit having a song storage location storing song data and an advertisement storage location receiving advertisement data"

■ Touchtunes argues that the "song storage location storing song data" and the "advertisement storage location storing advertisement data" in this term are expressed as separate and predefined storage locations in the data storage unit and proposes that the term be construed as "a data storage unit having separate structural advertisement and song locations within the data unit." Arachnid contends that the only word of this claim term about which the parties disagree is "location,"

which it defines as "a place in the memory where information is stored." Contrary to Arachnid's contention, however, Touchtunes appears to agree as to the definition of location. The parties disagree as to whether these locations are "separate" and "structural."

Touchtunes' proposed construction tracks the specification, which discloses that the "advertisement data is stored at a separate location on the storage unit 93 so that they can be easily located and tracked." '834 Patent 9:11–12. Touchtunes' construction is also supported by Arachnid's statements to the PTO during the prosecution of the '834 Patent, when it sought to distinguish the prior art ("Wain" and "William"):

> Clearly, a separate advertisement location within the data storage unit is a structural limitation.... Much like Wain, William simply does not describe separate structural advertisement and locations within a data storage unit.

Decl. of Joseph S. Presta ("Presta Decl."), Ex. 14. Arachnid argues that this statement is taken out of context and that it merely conveys Arachnid's argument that the prior art did not teach advertising, much less a data storage unit with locations for advertisement and song data. The Court agrees with Touchtunes, however, that Arachnid sought to distinguish the prior art by relying on separate and predefined storage locations for song data and advertisement data. Arachnid may not now change its position. *See Bd. of Regents of the Univ. of Texas Sys. v. BENQ Am. Corp.*, 533 F.3d 1362, 1372–73 (Fed. Cir.2008).

Arachnid also cites Judge Kennelly's rejection in the *Ecast* case of a "structural" or "physical" limitation in this term. However, the prosecution history was not discussed in the *Ecast* decision, and there is no suggestion in Touchtunes' proposed

construction that "structural" means "physical." Rather, Touchtunes clarifies that the term "structural" corresponds to the terms "folders" or "subfolders" used by Arachnid, in that it describes a predefined and preexisting place for receiving and storing particular data.

Touchtunes' proposed construction is consistent with the intrinsic evidence, including the prosecution history of the '834 Patent. The disputed term is therefore construed as "a data storage unit having separate structural advertisement and song locations within the data unit."

### I. "said advertisement data includes at least one time for said at least one advertisement to be run"

 The dispute regarding this term centers on the definition of the words "at least one time." Touchtunes proposes that term be construed as "at least one predetermined time," whereas Arachnid proposes that it be construed as "data which permits a determination of a time within which, or event in relation to which, said advertisement will be run."

Touchtunes notes that the patents describe the object of "the present invention" as having the jukebox run downloaded advertisements "at specified times." '398 Patent 2:43–48; '834 Patent 2:52–57. In discussing the only embodiment relating to the "at least one time" (or "when") the advertisement is to be run, the patents teach that the management system tells the jukebox "at what times" the advertisement should be run and that "[t]he advertisements can then be displayed at the predetermined times on the visual display 125." '398 Patent 9:4–8. While "at least one time" (or "when") could refer to a specific time of day, nothing in the language cited by Touchtunes requires such a limitation: it is clear that "at least one time" can refer to a time related to an event, not merely a time of day. The

specification even contemplates the possibility that an advertisement may not be run at all. See '398 Patent 9:17–21. This suggests that "at least one time" must include an event in relation to which the advertisement should be run, such that if the event does not occur, the advertisement does not run.

Furthermore, it is improper to import the limitations from the preferred embodiment cited by Touchtunes into the claim term. See Phillips, 415 F.3d at 1320.

For these reasons, the Court agrees with Arachnid and construes the term as "data which permits a determination of a time within which, or event in relation to which, the advertisement will be run."

### J. "data representing when and the number of times each of said advertisements is to be run"

 Touchtunes' proposed construction for this claim term, "data that tells the jukebox at what predetermined time each advertisement is to be run and the total amount of times the jukebox is to run each advertisement," renders the "number of times" language superfluous. If the specific time for each advertisement were included in the data, there would be no need to include data regarding the "number of times" the advertisement should be run. A construction that renders claim language superfluous is contrary to basic claim construction principles. See, e.g., British Telecomms. PLC v. Prodigy Commc'ns Corp., 189 F.Supp.2d 101, 113 (S.D.N.Y. 2002) ("[N]o claim language may be interpreted as mere surplusage.").

The term "when" in this claim is used in a similar way as the term "at least one time" in the previous claim term and is therefore construed as "a time within which, or event in relation to which" the advertisement is to be run, as Arachnid proposes. While this may include a prede-

termined time of day, it may also include information describing the time to run the advertisement by reference to an event, such as before, during, or after the event.

Touchtunes proposes that "number of times" be construed as "the total amount of times the jukebox is to run each advertisement," again seeking to import limitations from preferred embodiments into the claim. Arachnid proposes instead that it be construed as "the frequency an advertisement will be run within a given period." Touchtunes correctly points out that a frequency is determined by the number of occurrences over a given period of time, and that Arachnid's construction therefore contains a redundancy. However, the jukebox's ability to track the number of times an advertisement has actually run, *see* '398 Patent 9:17–29, supports Arachnid's proposition that "number of times" refers to the frequency with which the advertisement will be run. If "number of times" were construed as how many times a day, as Touchtunes proposes, there would be no reason to track the number of times an advertisement has actually run.

This term is therefore construed as "data which permits a determination of a time within which, or event in relation to which, the advertisement will be run and the frequency an advertisement will be run." This construction eliminates the redundant "within a given period" in Arachnid's proposed construction.

### K. "a number of times and when said at least one advertisement is to be run by said computer jukebox"

For the reasons set forth above, "number of times" is construed as "frequency an advertisement will be run" and "when" is construed as "a time within which, or event in relation to which." The Court therefore adopts Arachnid's proposed construction of this term.

### L. "the song record Including song identity data, comprising at least one of a song title, a song category, song address, song size, graphics address, graphics size, and play count"

Touchtunes contends that the conjunctive language in this claim term requires that the song record include at least one of *each* of the categories of information listed, whereas Arachnid contends that the song record only requires at least one of the categories of data.

The plain meaning of "at least one of ... and" is conjunctive and requires at least one of each category unless the intrinsic records requires a departure from such plain meaning. *See, e.g., SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 885–87 (Fed.Cir.2004); *cf. Joao v. Sleepy Hollow Bank,* 348 F.Supp.2d 120, 123–26 (S.D.N.Y.2004) (the phrase "at least one of ... and" should be construed to require the presence of all listed items unless doing so would contradict the specification or "render the claims utter nonsense").

Arachnid cites the '575 Patent specification as evidence in the intrinsic record of a departure from a conjunctive interpretation of the disputed claim term. Arachnid characterizes the '575 Patent specification as explaining that a song record is "a collection of song data representing *one or more* identifying characteristics of a song." (Arachnid Resp. 20 (emphasis in original).) However, nothing in the cited specification indicates that song data consists of "one or more" of the characteristics, as opposed to at least one of each. The only indication that certain fields may be blank is in the description of the "graphics address field," which is used for "a graphic image, *if any,* to be associated with a song." '575 Patent 3:48–53. But the "if any" language does not make the inclusion of graphics address

data optional, but rather allows for the possibility that the data might indicate that no graphic image is associated with the song.

Arachnid also argues that Touchtunes' proposed construction would render the phrase "at least one of" superfluous because the song record would always include data in each of the listed categories. This argument is incorrect, because even if data were always included in each of the listed categories, the phrase "at least one of" allows for the inclusion of more than one piece of data in some of the categories.

The Court therefore adopts Touchtunes' proposed construction.

### M. "adapted for"

Touchtunes proposes that the phrase "adapted for" as used in the various claims of the '575 Patent and the '189 Patent means "physical modification of a structure specifically for the use as further set forth in the claim." This construction is based on the prosecution history of these patents, during which Arachnid amended claims to add the "adapted for" language to certain previously recited structures. (*See, e.g.,* Presta Decl. Ex. 16 at 2 (changing the phrase "a display presenting song selections" to "a display adapted for presenting song selections").) These amendments were intended "to better clarify applicants' contribution to the art." (*Id.* at 7.) The modification of the claims to include the "adapted for" clause establishes that the clause is a limitation. *See* Manual of Patent Examining Procedure § 2111.04 (using "adapted for" as an example of claim language that may have a limiting effect and stating that "[t]he determination of whether [this] clause [ ] is a limitation in a claim depends on the specific facts of the case").

In contrast, Arachnid proposes that the term be construed as "combined and/or applied for use as further set forth in the claim." The phrase "applied for use" would not require any adaptation at all. Indeed, under Arachnid's proposed construction, for example, any unmodified display necessarily would be "adapted for presenting song selection" merely because the display operates in response to signals instructing it to present song selection. This construction removes the difference between the original and amended claims submitted by Arachnid during the prosecution of the patent and effectively reads the term "adapted for" out of the claims.

Touchtunes' proposed construction is consistent with the intrinsic record, including the prosecution history. The term "adapted for" is therefore construed as "physical modification of a structure specifically for the use as further set forth in the claim."

## V. CONCLUSION

For the reasons set forth above, the disputed claim terms are given the definitions set forth in this opinion.

It is so ordered.